# EXHIBIT A

Case 3:20-cv-01454-WQH-LL Document 127 Filed 03/26/20 PageID.849 Page 1 of 65
Case 3:20-cv-01454-WQH-LL Document 127 Filed 03/26/20 PageID.1270 Page 1 of 74
of 74

1  Lance Coburn (NV Bar No. 6604) ~~E-mail (pro hac vice) Email:~~ lance.coburn@procopio.com
2  Jeffery A. Garofalo (Bar No. 163271)
   Email:      jeff.garofalo@procopio.com
3  ~~PROCOPIO, CORY, HARGREAVES & SAVITCH LLP~~ Procopio, Cory, Hargreaves & Savitch LLP
4  3960 Howard Hughes Pkwy, ~~Suite~~ Ste 500 Las Vegas, NV 89169-5988
~~4  Telephone: 702.216.2684~~
5  Telephone: 702.216.2685
6  Eric A. Plourde (Bar No. 320451)
   E-mail:      eric.plourde@procopio.com
7  Brook T. Barnes (Bar No. 276667) E-mail:  brook.barnes@procopio.com
8  Procopio, Cory, Hargreaves & Savitch LLP
9  525 B Street, Suite 2200
   San Diego, CA 92101
10 Telephone: 619.238.1900
   Facsimile: ~~619.788.5500~~ 619.235.0398
   ~~5~~
11
   Attorneys for Plaintiff
12 Ei Corporation, Inc., a Nevada Corporation
   ~~6~~
   ~~7~~

13              UNITED STATES DISTRICT COURT
14         SOUTHERN DISTRICT OF ~~NEVADA~~

~~EI CORPORATION, INC., a Nevada corporation, Plaintiff,~~

~~CAPITAL PARTNERS, LLC, a Delaware limited liability company; QUALITY BUILT, LLC, a Delaware limited liability company; and JOHN GILLETT, an individual,~~

~~Defendants.~~

~~Case No._____~~

~~COMPLAINT~~

~~JURY DEMAND~~

~~FILED UNDER SEAL~~

~~10~~

~~11~~

~~12~~

14 CALIFORNIA 15

16 6 Ei CORPORATION, INC., a Nevada corporation,

17 **FIRST AMENDED**

Plaintiff,

18

v.

19

GALLANT CAPITAL PARTNERS, LLC, a Delaware limited liability company;
20 QUALITY BUILT, LLC, a Delaware limited liability company; and JOHN
21 GILLETT, an individual,

Defendants.

22

23

24

25

26

27

28

Case No. 3:20-cv-01454-WQH-LL

**COMPLAINT**

**JURY DEMAND**

**UNREDACTED VERSION FILED UNDER SEAL**

Judge: Hon. William Q. Hayes
Courtroom: 14B

Case 3:20-cv-01454-WQH-LL Document 92 Filed 08/26/20 PageID.850   Page 2 of 165

1    Plaintiff Ei Corporation, Inc. ("Ei" or the "Company"), by and through its

2 undersigned 20 counsel, hereby allege and plead against Defendants Gallant Capital

3 Partners, LLC ("Gallant"), 21 Quality Built, LLC ("Quality Built"), and John Gillett

4 ("Gillett") as follows:

5                    **NATURE OF THE ACTION**

1.    Instead of buying Ei and its sister companies as they purportedly wanted
6 to do, and after receiving nearly *all* of Ei's confidential, proprietary, and trade secret

7 information during due diligence under cover of a non-disclosure agreement,

8 Gallant and Quality Built poached Ei's President in violation of their agreement with

9 Ei and are now colluding with him to steal the Company's trade secrets, customers,

10 and employees in an effort to simply *copy* Ei's business rather than having to *pay*

11 to acquire it.

2.        Ei is the third-largest minority owned business in Nevada, built by Galo

12 LeBron, a 71-year-old African-American and Hispanic military veteran from the



14   Harvard Business School, completed his military service, and ultimately went on to

15   lead Ei for more than 24 years, building it into an internationally renowned leader in

16   its field and the third-largest minority owned company in the State of Nevada.

3.       LeBron started Ei with his own capital and has continued to be the sole

17   source of equity financial support for the Company in its 24-year history. LeBron

18   hired Gillett shortly after Gillett shut down his prior business venture that failed

19  ~~In 2019, Ei began~~ because it was unprofitable and ran out of capital. In 2014, LeBron offered Gillett a

20   twenty percent (20%) ownership stake in the sole Ei entity at the time, Energy

21   Inspectors Corporation ("Energy Inspectors") with no capital investment by Gillett.

22   In 2017, at Gillett's urging, LeBron consented to forming several new ventures of

23   which Gillett would be a significant owner. Gillett did not contribute any capital to

24   these new ventures.    LeBron's objective in these transactions was in aligning

25   Gillett's interests with LeBron's in growing a profitable business that could

ultimately be successfully sold.

4.	In 2019, with LeBron approaching his 70th birthday, Ei began exploring a potential acquisition or recapitalization.[23] The Company took steps to ensure that during the process of identifying a purchaser, negotiating a[24] deal, participating in the diligence process, and closing the deal, its confidential, proprietary, and[25] trade secret information and materials would be protected and would not be disclosed or used against it by others. These steps included requiring potential purchasers to contractually agree to[27] not utilize the Company's confidential information for their own benefit or to solicit the~~1~~ Company's employees. Ei also required its employees, including its President, Gillett, to~~2~~ contractually agree not to disclose the Company's confidential information or utilize it for the~~3~~ benefit of any party other than Ei, including competitors and/or potential purchasers, and in the~~4~~ case of Gillett agree not to directly or indirectly solicit any of the Company's employees, customers, vendors, suppliers,~~5~~ or manufacturers for a period of two years upon any departure from ~~the Company~~Ei.

5.	Despite the promises made to Ei, during the process of negotiating and conducting~~6~~ diligence related to potentially purchasing Ei, Gallant~~/~~ and Quality Built obtained a substantial amount~~7~~ of confidential, ~~proprietary, and trade secret~~ proprietary, and trade secret information, of the Company; engaged in improper~~8~~ communications with its President, Gillett, without Ei's knowledge; solicited Gillett and hired him~~9~~ to serve as President of Quality Built; and are now ~~working~~colluding with Gillet to utilize Ei's confidential~~10~~ information and trade secrets to expand their business to unfairly compete with Ei in areas in which~~11~~ Quality Built did not formerly operate. These efforts have included solicitation and hiring of key customers and employees in violation of Defendants' agreements with Ei and utilizing Ei's own confidential, proprietary, and trade secret information.

6.	Ei believed it was engaging a potential partner who would act in good

faith with respect to the acquisition, and wrongfully

25     solicited ~~a member of the~~ ~~Company's management team~~ <u>Ei's President</u> to leave the Company to join them in competing with Ei ~~using its~~

using Ei's own confidential, proprietary, and trade secret information which was
made available to~~15~~ Defendants by virtue of their positions of trust with the Company
(Gillett as an executive officer of~~16~~ the Company and Gallant/ and Quality Built as a
potential deal partner). Defendants are now ~~utilizing17~~using Ei's own confidential, proprietary,
and trade secret information against ~~it~~Ei, causing and continuing~~18~~ to cause irreparable
injury to the Company.

7.      To    prevent      continued   irreparable   harm   arising   from   Defendants'
conduct, Ei seeks~~19immediate~~ injunctive relief ~~in the form of a temporary restraining order and~~ ~~preliminary injunction20~~as set forth below. Ei also seeksand damages, costs, and fees as
appropriate, as set
forth below.

## PARTIES

8.      Ei is a domestic corporation organized under the laws of the State of
Nevada with~~22~~ its principal place of business at 2570 S. Miller Lane, Las Vegas,
Nevada 89117.

9.      Gallant is a limited liability company organized under the laws of the
State of~~23~~ Delaware with its principal place of business at 1800 Avenue of the Stars,
Suite 625, Los Angeles,~~1~~ California 90067.   Gallant regularly conducts business in the
State of Nevada including as~~2~~ described herein.

10.      Quality Built is a limited liability company organized under the laws of
the State of~~3~~ Delaware with its principal place of business at 633 S. Andrews Avenue,
Suite 204, Fort~~4~~ Lauderdale, Florida 33301.  Quality Built regularly conducts business
in the State of Nevada~~5~~ including as described herein.      Quality Built is qualified to do
business in Nevada~~6~~ (NV2010410858). Since approximately May 2019, Quality Built
has been owned by Gallant.

11.      Gillett is an individual residing in California who regularly conducts
business in the~~7~~ State of Nevada including as described herein~~.~~, and was listed as an
officer of various Nevada corporations for many years. Multiple filings of Gillet, Ei
and/or its related~~8~~ entities list Gillett's address as 2570 S. Miller Lane, Las Vegas,

1    traveled to Las Vegas to do business there on approximately twenty occasions or

2    more between January 2018 and10 present, typically spending between three and five

3    days in Las Vegas per trip, and has served as11President of a number of companies that are based in Nevada.

4    **JURISDICTION AND VENUE**

12.    This Court hasThe District of Nevada had original subject matter over this matter

5    pursuant to 28 U.S.C. § 133113 because at least one of the claims at issue are governed

6    by the laws of the United States,14 specifically the federal Defend Trade Secrets Act,

7    18 U.S.C. §§ 1836, *et seq.* and related statutes. The District of Nevada had

8    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 since the amount in

9    controversy exceeds $75,000 exclusive of interests and costs and there is complete

10    diversity of17 citizenship among the parties.    Plaintiff invokesinvoked the supplemental

11    jurisdiction of this Courtthe District of Nevada to hear18 and decide claims arising under state

12    law pursuant to 28 U.S.C. § 1367. This actions was transferred to this Court

13    pursuant to 28 U.S.C. § 1404. This Court has subject matter jurisdiction over this

14    matter for the same reasons.

13.    The District of Nevada had personal jurisdiction over Gillett because,

15    among other things, he has19engaged in business in the State of Nevada and in this judicial districtthe District

16    of Nevada and the acts complained of20 herein occurred in or were directed to the State of Nevada and this judicial district.

17    of Nevada and the District of Nevada. This Court has personal jurisdiction over

18    Gillett because he is a resident of California and this judicial district and because

19    Gillett moved to transfer this action to this Court and judicial district.

14.    The District of Nevada had personal jurisdiction over Gallant because, among other things, it has

20    among other things, it engaged in business in the State of Nevada and in the District

21    engaged in business in the State of Nevada and in this judicial district and the acts complained of herein occurred in or were directed to the State

Nevada and the District of Nevada. This Court has personal jurisdiction over

12. This

Gallant because its principal place of business is in California and because Gallant moved to transfer this action to this Court has and judicial district.

15. The District of Nevada had personal jurisdiction over Quality Built because, among other things,

1   it has engaged in because, among other things, it is registered and qualified to do business in the State of Nevada and in this judicial district and the acts,

2   it engaged in business in the State of Nevada and in the District of Nevada and the

3   acts complained of herein occurred in or were directed to the State of Nevada and the

4   District of Nevada. This Court has personal jurisdiction over Quality Built because

5   it has offices in San Diego, California and moved to transfer this action to this Court

6   complained of herein occurred in or were directed to the State of Nevada and this and judicial district.

16.   Venue is was proper in this judicial district the District of Nevada because a substantial part of

7   the events or 3 omissions giving rise to the claims occurred in this district or the District of Nevada or

8   otherwise because Defendants are 4 were subject to this Court the District of Nevada's personal

9   jurisdiction with respect to this action. Venue is proper in this Court because at least

10   one of the Defendants resides in this District and Defendants moved to transfer this

11   action to this Court and judicial district.

12                              **FACTUAL ALLEGATIONS**

13              **The Relationship between Ei, Gillett, and Gallant/ and Quality Built**

17.       Ei   is   a   third-party     building   engineering,   design,   inspection,   and

14   certification firm. 7 The Company specializes in providing consulting services for

15   large   scale   developers   on   single- 8 family residential,   multifamily   residential,

16   commercial, and mixed-use building projects. Ei has 9 been repeatedly recognized as

17   a leader in the industry.       For example, in 2020 the Company was 10 named the

18   Environmental Protection Agency ENERGY STAR Partner of the Year – one of the

19   highest awards in the industry – for the 14th consecutive year; is a six-time Indoor

20   airPLUS Leader 12 Award winner, including in 2018 and 2018; has twice been named

21   Build It Green's Greenpoint 13 Rater of the Year (in 2018 and 2019); has twice been

22   named the EPA WaterSense Partner of the 14 Year, including in 2018; and has received

23   numerous other honors and accolades.     Ei is a national 15 leader in engineering and

24   third-party inspection services to the residential building industry and 16 pioneer in the

25   sustainable building industry, assisting in the elimination of over 1.6 billion pounds

18.     Galo LeBron ("LeBron") is and at all relevant times was Chairman of the Board of Directors and Chief Executive Officer (CEO) of Ei. LeBron is a 71-year-old African-American and Hispanic military veteran from the South Bronx who despite coming from modest means worked hard to obtain a degree from Harvard Business School, completed his military service, and ultimately go on to lead Ei for more than 24 years, building it into an internationally renowned leader in its field, including being the third-largest minority owned company in the State of Nevada.

19.     Greg Cobb ("Cobb") was elected President of Ei on or about May 22, 2020 and previously served as Chief Financial Officer of the Company.

20.     Gillett served as President of Ei until his termination for cause on April 30, 2020 and had been with Ei for approximately 17 years.   Gillett is also a significant stockholder of Ei.      A true and correct copy of Gillett's Executive Employment Agreement with the Company, dated July 1, 2019 (the "Employment Agreement"), is attached hereto as Exhibit 1.

21.     Gillett's Employment Agreement, which he signed in Las Vegas, is governed by Nevada law and states:

> 3. Position and Duties.     During the Term of this Agreement, Executive agrees to perform the duties of President of the Company and such other duties as the Board may from time to time prescribe that are consistent with the duties of a President of a company of the size and nature of the Company, and such other duties as may be mutually agreed upon between the parties. …

> 5.6   Surrender of Records and Property.     Upon termination of Executive's employment with the Company, Executive shall deliver promptly to the Company all credit cards, computer equipment, cellular telephone, records, manuals, books, blank forms,

documents, letters, memoranda, notes, notebooks, reports, data, tables, calculations or copies thereof that are the property of the Company and that relate in any way to the business, strategies, products, practices, processes, policies or techniques of the Company. …

9. Non-solicitation. … [A]s a condition of employment hereunder, Executive agrees that during the Term of this Agreement and for a period of two years thereafter, Executive shall not:

9.1         directly or indirectly, without the prior written consent of the Company, hire or cause to be hired, solicit, recruit, raid, or encourage to cease to work with the Company or any of its subsidiaries or affiliates, any person who is at the time of such activity, or who was within the six (6) months period preceding such activity, an employee or contractor of the Company or any of its subsidiaries or affiliates; and

9.2         directly or indirectly, solicit, encourage, or cause any customer, vendor, supplier, or manufacturer of the Company to cease doing business with the Company or to reduce the amount of business such customer, vendor, supplier, or manufacturer does with the Company.

22.     In 2019, Ei began exploring a potential acquisition or recapitalization of the Company. The Company engaged investment banker Capstone Headwaters ("Capstone") as its agent to assist in the exploration of various strategic alternatives related to the potential sale of the Company. In July 2019, Gillett attended a private meeting in Gallant's offices in Los Angeles, California and did not disclose this meeting to Capstone, LeBron, or Cobb.     To this day, it is unknown to Capstone, LeBron, or Cobb what discussions took place at the meeting. Ultimately, Ei became primarily focused on considering one of two possible deals, either one with ████████████████████████████████████ partner (and owner) Gallant.

23.     On     October     18, 2019, Gallant executed a Confidentiality and Nondisclosure Agreement (the "NDA") with Capstone (on Ei's behalf). One of the key purposes of the NDA was to allow Ei to freely share highly sensitive confidential, proprietary, and trade secret information with Gallant and Quality Built without fear they would use it improperly.     A true and correct copy of the NDA is attached hereto as Exhibit 2.

24          The ADA is governed by Delaware law and states:

    WHEREAS, Recipient [Gallant] agrees [Gallant and Quality
25    Built] may receive, discuss, evaluate and examine written and oral information of
      the Company, including confidential information, which includes but
26    is not limited to the Company's business decisions, plans, procedures,

1    strategies and policies, legal matters affecting the Company,
     personnel, customer records information, trade secrets, bid prices,
2    evaluations of bids, contractual terms and arrangements (prospective
     purchases and sales), pricing strategies, financial and business
3    forecasts and plans and other information affecting the value or sales of
     products, goods, services or securities of the Company … in
4    connection with the potential acquisition of recapitalization of the
     Company by Recipient …
5
6         2.    Recipient [Gallant] agrees to hold all Proprietary
     Information in confidence.    Recipient agrees (a) not to use any
     Proprietary Information or any 1 information derived therefrom for its
7    own purposes except as required to analyze, 2 negotiate, and effect the
     Potential Transaction; …

3 cons. 7.
8
9         7.    Until the earlier of (a) the date a Potential Transaction is c      t
     umm consummated between the parti s parties, or (b) eighteen (18)
     months following he the Effective Date of this Agreement, shall not solicit for
10    employment or employ any 4 employee of the Company [Ei] without
      the prior written consent of the Company.
11

25.       As negotiations were progressing related to the two possible deals,

12    Gillett began 5 expressing a strong desire against Ei doing a deal with ████████

13    and in favor of doing a deal 6 with Gallant/ and Quality Built.    One of the reasons

14    expressed by Gillett for his preference was 7 Gallant/ and Quality Built planned to

15    make Gillett the CEO and highest-ranking employee of the 8 combined companies,

16    whereas ██████████ planned to make Gillett the President of one of their

17    regional divisions and second-ranking member of the combined companies.

26.       On January 18, 2020, Ei signed a Letter of Intent ██████████ contemplating the

18    acquisition of Ei ████████████████████████████████

21    ████████████████████████████████

10 by Gallant/Quality Built for a purchase price of $38 million. However, Gallant/Quality Built failed

11 to counter-sign the Letter of Intent and instead continued to negotiate with Ei for more favorable

FIRST AMENDED COMPLAINT

22    ████ . Around this time

23    period, ██████████ presented Ei with an executed ~~Letter of Intent~~13 contemplating

24    the acquisition of Ei for a purchase price of ██████████ ~~-~~ ██████████

Give 25 ████████████████████████████

~~14and Gallant/Quality Built's failure to counter-sign a Letter of Intent with~~

26    ~~Ei,~~ the Company's management team chose to accept the offer ~~from _____ .~~

27    from ██████████

FIRST AMENDED COMPLAINT

27.    Gillett        was upset with the decision to accept the offer from

█████████████ and took 16 actions that jeopardized the transaction. After the decision

was made, Gillett became difficult to reach, slow to cooperate with the due diligence

effort, and began to express a 17 number of new demands and requirements to the

Company's management, including but not 18 limited to that he would refuse to work

for █████████████ unless he was named CEO, if he was 19 not named CEO he would

refuse to roll any equity into the deal, and that he must be paid on the 20 deal fully in

cash.

28.    LeBron    and Cobb disclosed Gillett's new requirements to ████

████████ While 21 they were discouraged and disquieted, █████████████ chose to

continue moving forward with the 22 acquisition at that point.    In fact ███████████

agreed to revise the Letter of Intent to meet 1 most of Gillett's demands, including but

not limited to providing for payment of Gillett fully in cash 2 (approximately

$8 million),    with LeBron    rolling    additional equity    into the

transaction 3 (i.e, receiving

less cash) to make up for Gillett's cash requirement. Ei and █████████████ signed a

revised Letter of Intent ███████████████████████████ The ████████████

████ contained 5 an exclusivity clause prohibiting Company employees including

Gillett from engaging in 6 negotiations, meetings, or communications with third

parties with respect to any acquisition of the 7 Company or any part of the Company's

business, assets, or equity of the Company (other than 8 inventory in the ordinary

course) other than that with █████████████. Gillett was aware of the 9 exclusivity

clause.

29.    Shortly after execution of the ██████████████ LOI, Gillett called Cobb and

was very upset. 10 He expressed that the did not view the deal as a positive outcome

for himself and believed 11 Gallant , and Quality Built would have been willing to pay

more than ████████████████████████████████████████████████████████

12 only a few days earlier they had been unwilling to execute a Letter of Intent for a purchase price in

█████████████████

FIRST AMENDED COMPLAINT



30.     Despite Gillett's conduct, ███████████ and Cobb attempted to encourage Gillett14 to reconsider remaining with the business after the closing of the deal.     However, Gillett became15 ███████████ non-committal, and uncooperative, including expressing on multiple occasions that he was planning to leave the16 Company and taking other actions inconsistent with his job responsibilities.     The uncertainty around Gillett's commitment to remaining with the Company slowed down the transaction process;18 made it difficult for Ei, ███████████ to plan for post-closing integration or craft a functional19 management team organizational structure; and caused delay in the preparation of transactional20 documentation as the parties did not know whether Gillett would agree to roll any equity into21 the transaction.

31.     On February 25, 2020, while Ei was negotiating the transaction with ███████████, Gillett took a phone call from the President of Quality Built while attending the23 Residential Energy Services Network (RESNET) industry conference in Scottsdale, Arizona.24 The call lasted approximately 27 minutes. A member of the ███ management team attending the same conference was seated nearby and overheard John Gillett take the ████ call. ███ reported the ████████ call to ███.

███ reached out to1 Capstone and expressed that it viewed the call as a violation of the exclusivity clause in the2LOI ██████████.

32.     On March 23, 2020, ██████████ withdrew the ████████ LOI and the deal fell3 apart. Gillett's conduct was a substantial factor in the delay and ultimate withdrawal of the ██████████ LOI.4Absent Gillett's conduct, the acquisition between ███████████ and Ei would have closed by5 early March. Thus, Gillett's conduct caused a very attractive outcome for Ei and its shareholders6 to be lost.

33.     After the withdrawal of the ██████████ LOI, Gallant/ and Quality Built continued7 expressing interest in acquiring the Company. ██████████

27

28 ~~Capstone~~ and ~~Gallant/Quality Built executed a Letter of Intent contemplating the acquisition of Ei by~~ Ei made it very clear to Gallant and Quality Built that

Case 3:20-cv-01454-WQH-LL Document 92 Filed 08/26/20 PageID.860 Page 12 of 165

1  Ei did not intend to go forward with the transaction unless it had a high probability

2  of closing at the terms included 3

4  Gallant reaffirmed it was comfortable moving forward with the terms in

5  the even with the uncertainty created by the Covid-19 pandemic. Only

6  with this assurance was Ei willing to move forward as Ei did not wish to have

7  another failed acquisition process, with the distraction and disruption on the

8  management team and exposure of Company confidential information and trade

9  ~~Gallant/Quality Built for $38 million (the "Gallant LOI").~~ secrets to another entity.

34.  Over the course of the next few weeks, the parties engaged in an intense

10  due ~~10~~ diligence process during which Ei exposed a substantial amount of confidential

11  and proprietary ~~11~~ information and material regarding the Company to Gallant, and

12  Quality Built.  This included ~~12~~ disclosure of customer information, invoices, pricing,

13  locations, employee information, salaries, ~~13~~ technology information, business strategy,

14  and other highly sensitive trade secrets and confidential ~~14~~ and proprietary information

15  set forth in more detail below.  All of this information provided to ~~15~~ Gallant, and

16  Quality Built was expressly provided under the protection of the NDA.

35.  ~~On April 15, 2020, Gallant/Quality Built stunned Ei by withdrawing their~~ ~~16~~ ~~$38 million purchase offer and instead offering to buy~~ Throughout the due diligence process, Gallant and Quality Built openly

17  discussed the proposed management structure with Gillett as the future CEO of the

18  combined companies.  Gallant and Quality Built tasked Gillett with proposing an

19  organizational structure of how the two organizations would be combined, including

20  the elimination of any duplicate positions. Gillett also provided a detailed list of all

21  Ei employees and recommended compensation changes under the combined

22  structure.  Gillett engaged in at least several solo conversations with Gallant and

23  Quality Built executives with no other Ei management present.

12

FIRST AMENDED COMPLAINT

No explanation was provided for the dramatic change in price from the information gained during due diligence or with market conditions.    Gallant stated that Ei's due diligence materials largely confirmed their expectations of the Company ~~for $15 million with certain17potential future contingent proceeds.~~ 's performance. This significantly lower offer was confusing and extremely~~18~~ disappointing to Ei.    The offer was completely unacceptable to the Company, which terminated~~19~~ negotiations and communications with Gallant/ and Quality    Built on the same day and no acquisition occurred.  Ei management felt betrayed that Gallant and Quality Built had performed a "bait and switch" offer and that there had been no sincere intent to follow through on the █████████

**Gillett's Breaches of Fiduciary Duty, Derogation of Duties as President, and Termination for Cause**

37.        Gillett's behavior within the Company became increasingly erratic. He refused to meet with or discuss any key management decisions with LeBron, his direct supervisor. Gillett instructed the Company's controller to transfer funds from the Company's primary and most profitable entity, Energy Inspectors Corporation ("Energy Inspectors"), in which Gillett held a small equity stake, into smaller entities that were not profitable, including Ei Design, Inc. and Ei Risk Management Corporation, in which Gillett held a larger equity stake. This was in direct violation of instructions from LeBron, the CEO and sole board member of each of the Ei entities during this time.    Gillett hid details from LeBron, such as the fact that he loaned $15,000 of the Company's money to his friend and Ei employee, Brendan Ong, or that he violated the Company's policies to offer special perks such as excessive auto allowances, several months of extended paid leave, fully paid Company health benefits (potentially in violation of the Affordable Care Act) and

FIRST AMENDED COMPLAINT

responded that this was his way of ensuring personal loyalty of key employees and asked that LeBron not be informed to approve these special perks as Gillett claimed he had the authority to do so without LeBron's approval.

38.     Gillett's management transitioned from avoidance of LeBron to direct conflict.   This included Gillett's demand in March 2020 that Ei cut the pay of all employees immediately under the belief that a significant construction downturn was imminent. This was to be the first step before significant layoffs that Gillett planned. Gillett continued to aggressively push this narrative all while the Company's production volume and revenue remained largely unaffected by the Covid-19 pandemic. Even after the federal government passed the CARES Act, including the Payroll Protection Program, Gillett insisted on a Company-wide pay cut as a first step toward dramatic layoffs.    However, Gillett refused to heed his own advice on reducing costs and insisted on fully funding a software development project he was personally involved in that was months past its delivery deadline and hundreds of thousands of dollars over budget. He also refused to discuss selling or terminating a failed venture into the commercial design market (*e.g.*, Ei Design) that continued to lose tens of thousands of dollars a month with gross margins less than half that of other Ei entities. Instead Gillett insisted that Ei Design be funded with capital from other Ei entities with no proper loan or equity investment documentation, thus protecting his ownership in the Company at the expense of LeBron.        The only element holding the Company's executive team together was the prospect of a private equity transaction with Gallant and Quality Built where an ownership change would determine the future direction of the Company. LeBron made clear to Gillett that should the Gallant and Quality Built transaction not close, the direction of the Company would need to change and focus more on generating profits and transition away from the money-losing ventures Gillett had advocated.

39.     Prior   to   and   after   the   collapse   of   the   two   potential acquisition   deals,

FIRST AMENDED COMPLAINT

26. Gillett expressed on many occasions that he intended to leave. Even though he

1  continued to attempt to dictate corporate 22 strategy in certain areas against the wishes of the Company's management

2  of LeBron. Based on Gillett's 23 apparent lack of commitment to his responsibilities as

3  President, and unwillingness to align with the clear direction of LeBron and the

4  Board, on or about April 23, 2020, the Company made Gillett a generous separation offer. However, he refused it.        Ei remained 2

5  offer.  This offer was intended to give Gillett everything he wished for to create a

6  win-win outcome. The offer included the following elements: (i) a seven figure cash

7  payment; (ii) a full year of salary and health benefits for him and his family; (iii) full

8  intellectual property rights to the software development project, including the right to

9  commercialize the software and a commitment by Ei to continue funding

10  development of the software for its use and to be a customer of Gillett's new

11  software venture; (iv) a grant of LeBron's and Cobb's equity in Ei Design to Gillett

12  (and assistance with obtaining a Payroll Protection Plan loan from the SBA); and

(v)  an agreement to pay Gillett the same outcome he would have received if Ei

13  completed a transaction in a reasonable time period with either ███ or Gallant

14  and Quality Built and a lesser amount if completed with another third party (less the

15  value of the assets already transferred to Gillett).        However, Gillett refused Ei's

16  offer. Gillett also seemed to have lost all interest in the software project he had been

17  spearheading for months and in Ei Design the entity he had passionately defended as

18  a critical asset that would be very valuable in the future. Ei remained confused about

19  the reasons for Gillett's strange behavior and abrupt about-face in personal passions,

20  which it would soon come to discover.

40.        Prompted by Gillett's conduct during the preceding months, including

21  but not 3 limited to the February 25, 2020 phone call with Gallant/ and Quality Built

22  during the exclusivity period 4 with    another    buyer,    Ei conducted    an
    investigation    into

23  Gillett's                                          communications
    with 5 Gallant/ and Quality Built.                      On or about April 29,

24  2020, Ei concluded this investigation.        Shockingly, Ei 6 discovered each of the

25  following acts:

FIRST AMENDED COMPLAINT

26        a. ███████████████████████████

1 ███████████████████████████

2 ~~Built (approximately October 19, 2019 through January 21, 2020),~~ Gillett engaged in at least six~~8~~

phone calls and at least 27 text messages with Quality

3 Built, despite the fact that all~~9~~ communications with potential purchasers were

4 supposed to be routed strictly and exclusively~~10~~ through Capstone.

b.       During the exclusivity period of the ~~LOI~~ (███████████████

5 ██████ through March 23, 2020), Gillett engaged in at least six phone calls with

6 Gallant, at least eight~~12~~ phone calls with Quality Built, and at least 12 text messages

7 with Quality Built, in violation of the~~13~~ exclusivity clause of t███████████ ~~LOI.~~

c.       Between the time Ei and Gallant~~/~~ and Quality Built ceased

8 communications on~~14~~ April 15, 2020 and April 29, 2020, Gillett engaged in at least

9 three phone calls with Gallant, at~~15~~ least seven text messages with Gallant, and at least

10 two phone calls with Quality Built.

41.       Gillett's conduct and improper communications and coordination with

11 Gallant~~/~~ and Quality Built undermined Ei's efforts to reach a deal with ███████

12 ██████, Ei's~~17~~ negotiations with respect to reaching a deal with Gallant~~/~~ and Quality

13 Built, and Ei's efforts to reach any~~18~~ deal related to the potential acquisition or

14 recapitalization of the Company.

42.       Based on his conduct, including but not limited to collusion with

15 ~~On~~Gallant and Quality Built, on April 30, 2020, Ei terminated Gillett for cause. A true

16 and correct copy of the~~19~~ termination letter (the "Termination Letter") is attached

17 hereto as Exhibit 3.       The Company sent~~20~~ Gillett a FedEx box and label with

18 instructions to return his company laptop and cell phone.~~21~~       He ~~has~~ refused to do so,

19 including failing to respond to multiple phone calls and text messages~~22~~ related to

20 same.     The Ei company laptop and cell phone ~~contains~~contained a substantial amount of

21 confidential, proprietary, and trade secret information related to the Company,

22 including but not~~2~~ limited to the contact information for many Ei customers. Only

FIRST AMENDED COMPLAINT

Case 3:20-cv-01454-WQH-LL Document 92-8 Filed 10/23/20 PageID.1293 Page 40 of
24 of 74
The arrival of the equipment closely coincided with the filing date of this action.
Case 3:20-cv-01454-WQH-LL Document 92 Filed 08/26/20 PageID.865    Page 17 of 165

## **Quality Built Hires Gillett**

43.     On May 29, 2020, in a blatant and cavalier violation of the terms of the

NDA,~~3~~ Quality Built issued a press release announcing the hiring of Gillett to serve as

its President~~4~~ (the "Press Release"). A true and correct copy of the Press Release is

attached hereto as Exhibit 4.~~5~~ The Press Release stated among other things (emphasis

added):

> Gillett brings 18 years of construction industry experience … most
> recently as president of one of the industry's largest energy inspection
> and consulting~~7~~ firms. … [CEO Brian[]] Kramer sees the addition of
> Gillett, with his extensive building industry experience and "client
> first" approach to business, as a perfect~~8~~ fit with the culture of Quality
> Built and central to Quality Built's plans for future growth. "We have
> listened to our clients who are increasingly seeking **efficiency**~~9~~ and
> productivity gains to offset rising costs, focusing our efforts on
> leveraging our technology platform to provide business insights and on
> **expanding our service**~~10~~ offering to bundle services to deliver greater
> value per trip to the job site," Kramer says. "We are excited to have
> John join the Quality Built team and value~~11~~ his incredible knowledge
> and **deep relationships in the industry**, which will
>
> provide an important cornerstone for our future growth."

44.     Quality Built and Gillett sent the Press Release to members of the

industry including~~13~~ Ei customers.

45.     Gallant~~/~~ and Quality Built's hiring away of the Company's President,

collusion with him~~14~~ to destroy the Company, and outright stealing the Company's

business model, confidential information and trade secrets, constitute flagrant

violations of the Employment Agreement and NDA. Defendants are violating their

agreements~~16~~ with and duties to the Company on an ongoing and continuing basis,

including by directly or~~17~~ indirectly soliciting the Company's business by utilizing the

Company's own confidential,~~18~~ proprietary, and trade secret information against it, for

the purpose of directly competing with Ei to~~19~~ advance themselves to the Company's

detriment.

46.     As one example of how Defendants are stealing Ei's business model, Ei

engages in~~20~~    three    primary    areas    of    business    in    the

FIRST AMENDED COMPLAINT

engineering, (2) (2) energy/sustainability, and (3) quality assurance. Prior to the

1  hiring of Gillett, Quality Built 21 previously only engaged in the area of quality

2  assurance, but was interested in expanding its 22 business to enter the areas of

3  engineering and energy/sustainability as well. One of the key reasons 23 Gallant, and

4  Quality Built were interested in acquiring Ei was to provide a platform for Quality

5  Built to

1234567891011121314151617181920    enter the areas of engineering and energy/sustainability (in which Ei was

already operating).

6  already operating). However, rather than engage in an acquisition, Gallant, and

7  Quality Built were able to realize the benefit ████████████████████

8  simply by soliciting and hiring Gillett and utilizing the Company's own confidential,

9  proprietary, and trade secret information against it in violation of the agreements

10  with Ei.

47. The Press Release makes clear Quality Built and Gillett are utilizing

11  Ei's confidential information to enter the new business areas of engineering and

12  energy/sustainability to directly compete with Ei. Gillett states in the Press Release

13  that Quality Built is well-positioned to leverage his experience to "provide solutions

14  that help shorten our clients' design and build cycles" (*i.e.*, engineering). The Press

15  Release states that among other areas, Quality Built specializes in "sustainable

16  building practices" (*i.e.*, energy/sustainability). Gillett further states in the Press

17  Release: "We have listened to our clients who are increasingly seeking efficiency"

18  (*i.e.*, energy/sustainability) and that Quality Built will focus its efforts on "expanding

19  our service" to "bundle serves to deliver greater value per trip to the job site." These

20  are all areas of operation in which Quality Built did not operate until after it solicited

21  and hired away Ei's President away.

48. Additionally, since hiring Gillett, Quality Built has begun hiring

22  employees for positions in these new areas of engineering and energy/sustainability

23  in which it did not previously operate prior to Gillett's hiring, based upon the model

24  they nefariously stole from Ei. For example, Quality Built has posted each of the

FIRST AMENDED COMPLAINT

a. "Field Consultant – Sustainability – REMOTE – Southern California";

b. "Field Consultant – Sustainability – REMOTE – Texas";

c. Energy Modeling Analyst – REMOTE – Anywhere in US";

d. Director of Sustainability Programs – REMOTE – Anywhere in US";

e. Director of Operations & Engineering – Eastern & Central Regions – REMOTE."

49. A true and correct copy of the "Careers at Quality Built" page of Quality Built's website as it existed on June 8, 2020 is attached hereto as Exhibit 5.

50. All of the above job postings concern the areas of engineering or energy/sustainability, in which Quality Built did not operate prior to receiving Ei's detailed business model pursuant to the NDA and hiring Gillett, in violation of the NDA and Gillett's Employment Agreement. Moreover, these positions that are now posted by Quality Built are taken directly from Ei's model and it is clear that

5 plan Ei took great pains to

15   protect through the NDA and Employment Agreement.

51.        Ei sought to execute a deal that would create maximum value for the

16   Company and

6 its shareholders.    The Company took appropriate steps to ensure that

17   during the process of

7 negotiating with potential purchasers its employees would not

18   improperly disclose, appropriate, or

8 otherwise utilize its confidential, proprietary,

19   and trade secret information. It also took appropriate

9 steps to ensure that during the

20   process of negotiating and conducting diligence with the Company

10 those potential

21   purchasers would not improperly disclose, appropriate, or otherwise utilize its

22   confidential, proprietary, and trade secret information or solicit its employees for

23   their own benefit.

52.        Instead of living up to the promises they made to Ei in this regard,

24   Gillett and

12 Gallant/ and Quality Built chose to violate their various agreements to

collude, steal customers and employees, and directly and unfairly compete against

Ei using its Ei's own confidential, proprietary, and trade secret information.

53. The actions of Defendants have damaged the financial viability of Ei, cost the ▮▮▮▮▮ Company an opportunity to execute an acquisition worth , and have caused non-compensable significant damages to Ei's business reputation and goodwill that it has developed at great effort and expense over the years. Defendants conduct has thus caused and continues to cause irreparable and ongoing harm against the Company.

**Quality Built is Bound by the NDA**

54. Quality Built is bound by the terms of the NDA for a number of reasons.

55. First, Gallant and Quality Built at all times represented that Gallant was authorized to act on Quality Built's behalf with respect to the potential deal with Ei. Throughout the process of diligence and negotiation between the parties, Gallant and Quality Built made clear that Gallant was acting on Quality Built's behalf, including when executing legal documents. ▮▮▮▮▮

FIRST AMENDED COMPLAINT



56.    Second, the NDA by its express terms applies to parties, like Quality Built, to whom Gallant disclosed confidential information in order to further the purposes of the NDA:

> Recipient agrees … (b) not to disclose any Proprietary Information or any information derived therefrom to any person or entity, including any parent, subsidiary, affiliate or potential financing partners of Recipient, except such officers, directors, employees, agents, potential financing partners or advisors of Recipient who: (i) have a need to know the Proprietary Information in order to evaluate the Proprietary Information for the purposes set forth herein; and (ii) to the extent not an employee of Recipient, are required to protect the information as confidential and informed of the terms of this Agreement.

57.    Third, the NDA is essentially Capstone's standard NDA.    Capstone itself always understood that Quality Built was subject to the terms of the NDA. In Capstone's view, as expressed in a sworn declaration by Darin Good, Managing Director and Partner with Capstone, Gallant and Quality Built always acted together throughout the process of consideration of a potential acquisition of Ei and presented themselves as a team in consideration of the acquisition. For example, after Gallant and Quality Built were identified as finalists for a potential acquisition, a meeting occurred (in Las Vegas) between representatives from Ei, Capstone, Gallant, and Quality Built to discuss next steps.    And again, the proposals to acquire Ei that Capstone received from Gallant stated they were being submitted "[o]n behalf of

FIRST AMENDED COMPLAINT

26 | Quality Built was subject to the terms of the NDA."

58. | To the extent not otherwise bound by the NDA, Quality Built is a third-

1 | party beneficiary of the NDA who accepted the benefits thereof and is therefore

2 | bound by the agreement.

59. | On July 16, 2020, Judge Andrew Gordon of the District of Nevada

3 | issued a temporary restraining order in this action in which he determined that

4 | "[a]lthough Quality [Built] disputes it is bound by the NDA, as discussed at the

5 | hearing there are at least serious questions as to whether Quality [Built] is bound by 7

it."

**18 The Specific Confidential, Proprietary, and Trade Secret Information in Possession of Gillett and Gallant, and Quality Built**

23
9

60. | Ei has conducted an investigation to determine the specifics and extent

10 | of the

24 confidential, proprietary, and trade secret information and materials which are

11 | in the possession of

25 Gillett. Based on the Company's investigation, and to the best

12 | of the Company's present

26 knowledge, Gillett is in possession of at least the

13 | following:

28

a. | At least 10,170 received emails and 2,485 sent emails which

14 | cover all

1 aspects of the Company's business, including customer communications,

15 | service pricing, strategic

2 plans, financial statements, and employee compensation.

b. | 144 contacts with phone numbers and/or email addresses,

FIRST AMENDED COMPLAINT

3 customers, with the remainder of the contacts largely consisting of

17    partners and employees of the

4 Company.

c.                Every document Gillett has created or received by virtue of his

18    employment

5 with Ei since 2006.

d.                Budgets for Ei-affiliated entities Ei Engineering, Ei Design,

19    Energy

6 Inspectors Corp., and Ei Risk Management.

e.                Financial statements for Ei Engineering, Ei Design, Energy

20    Inspectors Corp.,

7 and Ei Risk Management.

f.                Strategic business plans for Ei Engineering, Ei Design, Energy

21    Inspectors

8 Corp., and Ei Risk Management.

g.        Customer presentations.

h.        Documents which set forth Ei's customer pricing and proposals related to customer pricing.

i.        Documents related to Ei's efforts to develop software and technology.

6.    Ei has conducted an investigation to determine the specifics and extent of the confidential, proprietary, and trade secret information and materials which are in the possession of Gallant and Quality Built. Based on the Company's investigation, and to the best of the Company's present knowledge, Gallant and Quality Built is in possession of at least the following:

a.        More than 3 gigabytes of data and 3,422 files labeled "Confidential" and provided to them by Ei as part of the diligence process.

b.        A list setting forth all of Ei's customer sales annually going back for a period of three years, organized by project type and region.

c.        All monthly financial statements for the Company and Ei Engineering, Ei Design, Energy Inspectors Corp., and Ei Risk Management going back to 2016.

d.        All annual financial statements for the Company and Ei Engineering, Ei Design, Energy Inspectors Corp., and Ei Risk Management for 2006

FIRST AMENDED COMPLAINT

e.            Substantial supplementary balance sheet information, including (i)

(i)    accounts

2 receivable reports from 2017 through the present, (ii) monthly bank

14    statements and reconciliations

3 for every bank account for the Company for the prior

15    two years, and (iii) a listing of all capital

4 expenditures of the Company and Ei

16    Engineering, Ei Design, Energy Inspectors Corp., and Ei Risk

5 Management.

f.            Substantial        supplementary    income    statement    information,

17    including

(i) (i) details of sales/bookings listings by region, service type, and month for

18    the Company and Ei

6 Engineering, Ei Design, Energy Inspectors Corp., and Ei Risk

FIRST AMENDED COMPLAINT

1  Management for 2014 through the

7 present.

g.      A detailed listing of every invoice, including customer, date,

2  project,

8 services delivered, and pricing, for the Company and Ei Engineering, Ei

3  Design, Energy Inspectors

9 Corp., and Ei Risk Management from 2014 through the

4  present.

h.      Detailed budgets for each of the Company and Ei Engineering, Ei

5  Design,

10 Energy Inspectors Corp., and Ei Risk Management for 2019 and 2020.

i.      Copies of virtually every corporate legal agreement of the

6  Company,

11 including the Company's real estate lease agreements, equipment lease

7  agreements, supplier and

12 vendor agreements, nondisclosure agreements, software

8  licensing   agreements,   loan/financing

13 agreements, joint   venture      agreements,

9  acquisition agreements, and many other agreements.

j.      Every agreement with all of Ei's customers, which includes 1,419

10  customer

14 contracts with details of all services, pricing, and payment terms.

k.      A list of all of the intellectual property of the ~~company~~Company for each

11  of the

15 Company and Ei Engineering, Ei Design, Energy Inspectors Corp., and

12  Ei Risk Management.

l.      A detailed employee census, which lists the name, home address,

13  personal

16 phone number, social security number, position, pay rate, date of hire,

FIRST AMENDED COMPLAINT

17    information as to each employee.

m.          All of Ei's employment agreements.

n.          Due diligence materials, letters of intent, and agreements related

15    to prior

1     acquisitions in which the Company engaged.

62.          Based on the recent hiring of Gillett and on Gallant, and Quality Built's

16    exposure to Ei's

2     business, it is certain Defendants are in possession of a substantial

17    amount of additional

3     confidential, proprietary, and trade secret information beyond

18    that which is listed above.

28

FIRST AMENDED COMPLAINT

**Specific Breaches of the Non-Solicitation Provisions in the Employment Agreement and NDA**

63. Defendants are engaged in active efforts to solicit Ei customers and employees in violation of the Employment Agreement and NDA, including but not limited to the following examples:

64. *Gallant and Quality Built Solicit and Hire Gillett.* Quality Built solicited and hired away Gillett, Ei's President. Gillett was terminated for cause on April 30, 2020. Defendants have admitted in this litigation that Gallant and Gillett discussed potential employment with Quality Built on April 21, nine days before Gillett's employment terminated. Quality Built formally offered Gillett a position as President of Quality Built on May 2, only two days after his termination, clearly indicating there was premeditation and discussion occurring before this date. In fact, Ei's investigation revealed that Gillett engaged in dozens of improper communications with Gallant and Quality Built while he was still President of Ei as set forth above, including during the exclusivity period with another buyer. These facts make clear that a deal between Defendants was reached long before May 2. Thus, Quality Built solicited and hired Gillett in violation of the NDA's requirement that Quality Built "shall not solicit for employment or employ any employee of the Company."

65. *Solicitation of EnergySoft, TriPoint, and Lennar.* On June 24, 2020, an employee of EnergySoft, a vendor whose services Ei uses to calculate the federal 45L tax credit compliance, informed Ei that Gillett reached out to her, explained he had joined Quality Built, and was interested in pursuing 45L tax credit business. She also informed Ei that Quality Built had recently won the 45L processing business from two builders, TriPoint and Lennar, who were Ei customers. The 45L tax credit business was conceived of and developed by Ei employees other than Gillett and is Ei's most profitable business area. Thus, Gillett solicited EnergySoft, TriPoint, and Lennar (on in formation and belief using Ei's own proprietary and trade secret

FIRST AMENDED COMPLAINT

1    information) in violation of the Employment Agreement's requirement that he shall

2    not "directly or indirectly, solicit, encourage, or cause any customer, vendor,

3    supplier, or manufacturer of the Company to cease doing business with the Company

4    or to reduce the amount of business such customer, vendor, supplier, or manufacturer

5    does with the Company."

66.    Solicitation of Sunrun. Ei has a signed agreement and current exclusive

6    partnership with Sunrun, Inc.    Sunrun is a residential provider of solar electricity,

7    related to the new residential construction market for solar panels. Sunrun recently

8    informed Ei that Gillett called Ei's primary contact at Sunrun and left voicemail

9    messages regarding his desire to form a relationship. Ei's relationship with Sunrun

10   is exclusive, which Gillett knows.    The only way Quality Built could form a

11   relationship with Sunrun would be to terminate its relationship with Ei. Thus, Gillett

12   again used proprietary information to solicit Sunrun in violation of the Employment

13   Agreement's requirement that he shall not "directly or indirectly, solicit, encourage,

14   or cause any customer, vendor, supplier, or manufacturer of the Company to cease

15   doing business with the Company or to reduce the amount of business such

16   customer, vendor, supplier, or manufacturer does with the Company."

67.    Solicitation of Melissa Jacobsen.    Danielle Armentrout is Ei's former

17   Director of Sales & Marketing and worked closely with Gillett at Ei. Very soon after

18   Ms. Armentrout left Ei, she joined Quality Built. On July 9, 2020, Ei learned Ms.

19   Armentrout had reached out to an Ei employee, Melissa Jacobsen, via social media,

20   asked if she was happy at Ei, and stated Quality Built was hiring. Ms. Jacobsen got

21   the impression Ms. Armentrout was also reaching out to other Ei employees as well.

22   In possession of Ei's confidential salary information regarding all of Ei's employees,

23   Quality Built solicited Ms. Jacobsen in violation of the NDA's requirement that

24   Quality Built "shall not solicit for employment or employee any employee of the

25   Company." Further, Ms. Armentrout works for Mr. Gillett and is therefore his agent.

26   Thus, the solicitation of Ms. Jacobsen also violated the Employment Agreement's

FIRST AMENDED COMPLAINT

1   requirement that Gillett "shall not directly or indirectly, without the prior written

2   consent of the Company, hire or cause to be hired, solicit, recruit, raid, or encourage

3   to cease to work with the Company or any of its subsidiaries or affiliates, any person

4   who is at the time of such activity, or who was within the six (6) months period

5   preceding such activity, an employee or contractor of the Company or any of its

6   subsidiaries or affiliates."

68.   Solicitation and Hiring of Jun Molina.   Ei learned on July 13, 2020, that

7   one of its employees, Jun Molina, intended to leave Ei after he told LeBron he had

8   been "headhunted" by Quality Built.   At the time, he stated he intended to remain

9   with the Company for two more weeks. He also stated he would consider potentially

10   remaining with the Company after speaking with Galo LeBron of Ei. Judge Gordon

11   issued a TRO in this matter on July 16; the next day, Mr. Molina changed his mind

12   and left the Company that day.   He also changed his story, claiming he had come

13   across a job posting on Quality Built's website himself.   Then, Mr. Molina started

14   working for Quality Built on July 28, 12 days after the TRO was issued ordering that

15   Quality Built was restrained "from soliciting for employment or employing any

16   employee of Ei." Thus, Quality Built solicited and hired Mr. Molina (knowing his

17   confidential salary and benefits information) in violation of the NDA's requirement

18   that Quality Built "shall not solicit for employment or employ any employee of the

19   Company." Further, Mr. Gillett is Quality Built's President. Thus, the solicitation of

20   Mr. Molina also violated the Employment Agreement's requirement that Gillett shall

21   not "directly or indirectly, without the prior written consent of the Company, hire or

22   cause to be hired, solicit, recruit, raid, or encourage to cease to work with the

23   Company or any of its subsidiaries or affiliates, any person who is at the time of such

24   activity, or who was within the six (6) months period preceding such activity, an

25   employee or contractor of the Company or any of its subsidiaries or affiliates."

69.   Solicitation of KB Home Inland Empire ("KB Inland"). On July 29, an

26   employee from KB Inland, a division of KB Home, informed Ei employee Estee

FIRST AMENDED COMPLAINT

1    Williamson that "the guy from Quality Built who used to be at Ei" was offering KB

2    Inland the "same deal" as Ei with respect to Home Energy Rating System ("HERS")

3    inspections.   KB Home is Ei's biggest customer.    Defendants are in possession of

4    Ei's proprietary customer pricing information, contacts, and proprietary methods for

5    conducting HERS inspections, thus allowing Gillett and Quality Built to offer

6    KB Inland the "same deal" as it has with Ei.      Thus, Gillett unfairly solicited KB

7    Inland using Ei's confidential, proprietary, and trade secret information and in clear

8    violation of the Employment Agreement's requirement that he shall not "directly or

9    indirectly, solicit, encourage, or cause any customer, vendor, supplier, or

10   manufacturer of the Company to cease doing business with the Company or to

11   reduce the amount of business such customer, vendor, supplier, or manufacturer does

12   with the Company." Defendants know Ei's pricing with respect to KB Inland and on

13   information and belief are utilizing such information to solicit business away

14   from Ei.

70.      Solicitation and Hiring of Rebecca Heilig. On June 11, 2020, Rebecca

15   Heilig, President of Energy Inspectors Corporation, Ei's largest revenue producing

16   company, submitted her resignation.    Ms. Heilig was very close to Gillett during

17   their time working at Ei. Upon resignation, Ms. Heilig did not indicate whether she

18   was joining Quality Built, but Ei assumed that would be her destination given

19   Gillett's recent conduct and their relationship. After she resigned, Ei requested Ms.

20   Heilig return her Company computer and cell phone, but she stated it would not be

21   convenient for her to do so before a planned sailing trip. Upon return from her trip,

22   Ei requested she return the equipment to the Company that day, but Ms. Heilig

23   refused and said she would hold on to them until June 26 and stated to staff members

24   attempting to coordinate a return of the equipment that she needed the computer for a

25   few days to get some things off of it.      On August 4, 2020, the day after Judge

26   Gordon's TRO in this matter expired, Ms. Heilig posted an update on LinkedIn

27   announcing her new position as Director of Sustainable Programs at Quality Built.

31

FIRST AMENDED COMPLAINT

Ei also understands Ms. Heilig reached out to Arizona Public Service's (APS) incentive program about becoming an approved HERS rater, indicating Quality Built intends to continue using Ei's proprietary information and trade secrets to move into the energy space and to match Ei's scope of work using Ei' proprietary techniques. On information and belief, Gillett and Quality Built solicited and hired Ms. Heilig in violation of their agreements with Ei.

71.     Solicitation and Hiring of Brendan Ong. Brendan Ong was an Account Manager for Ei in the Southern California Office.     Previously, he was Executive Vice President of Operations for Ei and Development Manager responsible for a project called Blackbird.   Mr. Ong was close with Gillett.     On June 16, 2020, Mr. Ong announced he was resigning from Ei. Surprisingly, Mr. Ong told Ei that he did not have any immediate plans for his future employment, other than to spend the summer with his son, but because of his relationship with Gillett, Ei suspected he was leaving to join Quality Built.     On August 12, 2020, Mr. Ong submitted a declaration in this action, indicating he had joined Quality Built.      Mr. Ong's declaration indicated that while Mr. Ong was still an employee of Ei, he spoke to Gillett about Quality Built and they discussed the prospect of employment with Quality Built for Mr. Ong, who submitted an application through Quality Built's website. Mr. Ong, a close friend of Gillett, announced his resignation from Ei only five days after Rebecca Heilig, another close friend of Gillett, announced she was also leaving the Company.     Neither indicated any future employment plans at the time they left Ei, but both are now employees of Quality Built. On information and belief, Gillett and Quality Built solicited and hired Mr. Ong in violation of their agreements with Ei.

72.     Solicitation of KB Las Vegas.     On August 4, 2020, Amber Mahrou, Division Vice President at Ei, was informed by a representative of KB Home Las Vegas ("KB Las Vegas"), a division of KB Home, Ei's biggest customer, that it had received an unsolicited bid for KB Las Vegas's energy testing work. The KB Las

FIRST AMENDED COMPLAINT

1    Vegas representative did not indicate the bid came from Quality Built, but it is
2    already clear from Ms. Williamson's prior conversation with KB Inland that Gillett
3    and Quality Built were improperly targeting KB Homes' business.          Further,
4    Ms. Mahrou and Gillett are the only Ei team members who have met with KB Las
5    Vegas's purchasing team in Las Vegas during the last several years.       The KB Las
6    Vegas representative stated that the KB Las Vegas staff discussed if it would be
7    ethical to accept this bid because it was from a former Ei employee who was aware
8    of Ei's proprietary pricing information and techniques.        Defendants know Ei's
9    pricing and techniques with respect to KB Las Vegas and on information and belief
10   are utilizing such proprietary information and techniques to solicit business away
11   from Ei.
73.        Solicitation of Taylor Morrison.          For years, Ei has performed energy
12   services for Taylor Morrison, a customer in Texas, while Quality Built has long
13   performed quality assurance services for the same customer.      Since Gillett joined
14   Quality Built, Quality Built is now offering bundled services for both quality
15   assurance and energy services to Taylor Morrison.      Defendants know Ei's pricing
16   with respect to Taylor Morrison and proprietary techniques for both services and on
17   information and belief are utilizing such information to solicit business away from Ei
18   in violation of their agreements with Ei.
74.        Solicitation of Pulte Homes.          On August 11, 2020, a former Ei
19   employee who now works for Pulte Homes ("Pulte") in Las Vegas made Ei aware
20   that Gillett had recently been in contact with Pulte's Las Vegas office offering to
21   perform energy inspection work for Pulte. Pulte is an Ei customer for whom Ei does
22   the majority of energy inspection work in Las Vegas.      On April 13, 2020, Pulte
23   purchasing manager, Wayne Newmiller, informed Ei that Danielle Armentrout had
24   reached out to him to set a meeting and told him that Gillett was now at Quality
25   Built. A virtual meeting occurred during which Gillett offered Pulte the full package
26   of services currently being offered by Ei. Defendants know Ei's proprietary pricing,

FIRST AMENDED COMPLAINT

services and scope of work with respect to Pulte Homes and on information and belief are utilizing such information to solicit business away from Ei in violation of their agreements with Ei.

**Particular Allegations Related to**
**Misappropriation of Trade Secrets**

75. By virtue of his position as President, Gillett was in possession of substantial confidential, proprietary, and trade secret information of Ei, including but not limited to on his Company phone and laptop. Gillett was terminated on April 30 but did not return the Company's phone and laptop until June 8. Gillett claims he has not accessed the information contained on his Company phone or laptop since May 1, but says nothing about what he did with those materials from April 21 (the date Defendants admit he spoke with Gallant regarding potential employment with Quality Built) to May 1. On information and belief, Gillett has copies of some or all of the data that was contained on his computer and phone. Gillett has never claimed to have destroyed all of Ei's confidential, proprietary, and trade secret information, or that he never copied any such materials. The same holds true with respect to Gallant and Quality Built, who were able to pull back the curtain during the diligence process and received essentially all of Ei's confidential, proprietary, and trade secret information, most of it at their own request.

76. The specific universe of information and data possessed by Defendants is set forth in detail above, but in any event is immense. In short, Defendants have Ei's entire confidential playbook, which was provided to them in strict confidence and trust by virtue of the restrictions of the Employment Agreement and NDA. Now, Defendants are colluding to use the trade secret information they obtained to destroy Ei using its information and business model against it, including but not limited to the following specific examples:

77. Misappropriation of Non-Public and Comprehensive Customer Information. As set forth above, Defendants are in possession of all of Ei's non-

FIRST AMENDED COMPLAINT

public customer information, including but not limited to customer lists, customer pricing information, every agreement with all of Ei's customers (which includes 1,419 customer contracts with details of all services, pricing, and payment terms), and customer purchasing histories.    There is virtually no Ei customer information that Defendants do not possess.    Ei's customer information constitutes a valuable asset of Ei that would be virtually impossible for a competitor to acquire or duplicate other than through disclosure by Ei itself.    Ei took reasonable steps to protect this information including through the use of agreements such as the Employment Agreement and NDA.    Each Ei document received by Gallant and Quality Built through the due diligence process was water-marked indicating it was confidential information to Ei.    Further, it is clear Defendants are soliciting Ei's customers specifically using this information.    For example, KB Inland has informed Ei that Quality Built, including specifically "the guy from Quality Built who used to be at Ei," were offering KB Inland "the same deal" as Ei with respect to HERS inspections. KB Home is Ei's biggest customer. It would not be possible for Quality Built and Gillett to offer the "same deal" as Ei without utilizing Ei's confidential, proprietary, and trade secret information related to its customer list, pricing information, and agreements with its customers. On information and belief, Quality Built and Gillett are utilizing such information to solicit business from Ei's existing customer base, including by undercutting Ei's agreements with those customers based on such information.

78.    Misappropriation of Ei's Non-Public Marketing Lists.    Defendants are in possession of Ei's non-public marketing lists. During her time with Ei, Danielle Armentrout, now a Quality Built employee, would send out daily emails to this list of recipients. Such information is not publicly known. Ei compiled the list over the course of many years.    The marketing lists constitute a valuable asset of Ei that would be virtually impossible for a competitor to acquire or duplicate other than through disclosure by Ei itself. Ei took reasonable steps to protect this information

FIRST AMENDED COMPLAINT

including through the use of agreements such as the Employment Agreement and NDA. Each Ei document received by Gallant and Quality Built through the due diligence process was water-marked indicating it was confidential information to Ei. On information and belief, Quality Built and Gillett are utilizing such information to solicit Ei's customers and/or expand into the areas of energy/sustainability and engineering to unfairly compete with Ei.

79. Misappropriation of Non-Public and Comprehensive Employee Information. Defendants are in possession of all of Ei's non-public human resources information and employee-specific information, including a detailed employee census, which lists the name, home address, personal phone number, social security number, position, pay rate, date of hire, benefits, and other information as to each employee. Such information a valuable asset of Ei that would be virtually impossible for a competitor to acquire or duplicate other than through disclosure by Ei itself. Ei took reasonable steps to protect this information including through the use of agreements such as the Employment Agreement and NDA. Each Ei document received by Gallant and Quality Built through the due diligence process was water-marked indicating it was confidential information of Ei. Quality Built has hired at least Gillett, Brendan Ong, Danielle Armentrout, Jun Molina, and Rebecca Heilig, all of whom are former Ei employees, and all of whom left Ei on their own volition with the exception of Ms. Armentrout. On information and belief, Quality Built and Gillett utilized Ei's confidential, proprietary, and trade secret information to solicit and hire these employees and continue to utilize such information to solicit current Ei employees (for example, Melissa Jacobsen). Such information is perfectly tailored to allowing Gallant and Quality Built to craft competitive employment offers to Ei's employees.

80. Misappropriation of Non-Public Information and Comprehensive Trade Secrets Related to the 45L Tax Credit Business. During the diligence process, one of the primary areas Gallant and Quality Built requested information about was Ei's

FIRST AMENDED COMPLAINT

1   45L tax credit business.      For example, Gallant sent a Quality of Earnings Due
2   Diligence Request List to Ei during the diligence process.      A quality of earnings
3   report provides detailed analysis of all of the components of the Company's revenue
4   and expenses.   One of the primary objectives of a quality of earnings report is to
5   assess the sustainability and accuracy of historical earnings and the achievability of
6   future projections. The Quality of Earnings Due Diligence Request List requested a
7   number of categories of information.      The first item on the list concerned detailed
8   information related to Ei's 45L tax credit business, including "(i) 45L activity
9   performed each year from FY16 – FY20 (estimated) broken out by loots[;] (ii) 45L
10  activity for lots each year that qualified for the certification, and therefore would
11  generate revenue[;] (iii) 45L activity performed each year from FY16 – FY20
12  (estimated) broken out by **plan**[;] (4) 45L activity for **plans** each year that qualified
13  for the certification, and therefore would generate revenue," and other categories of
14  information related to Ei's 45L tax credit business. In response, Ei provided all of
15  the requested information, including files titled "3.9.9 45L Cumulative Report_12-
16  31-19," "3.9.8 Lots/Units Tested by Region," and "3.9.10 Ei Fed Tax
17  Analysis_16-18," and provided significant additional 45L tax credit-related
18  information in the diligence process.      Ei's compilation of 45L tax credit business
19  information constitutes a valuable asset of Ei that would be virtually impossible for a
20  competitor to acquire or duplicate other than through disclosure by Ei itself. Ei took
21  reasonable steps to protect this information including through the use of agreements
22  such as the Employment Agreement and NDA.      Each Ei document received by
23  Gallant and Quality Built through the due diligence process was water-marked
24  indicating it was confidential information of Ei.      Now, Defendants on information
25  and belief are soliciting Ei's customers in the 45L tax credit space, despite having
26  not previously operated in that space, including customers and partners like
27  EnergySoft, TriPoint, and Lennar, using not only Ei's pricing and other customer
28  information in their possession but also the specific non-public documents,

FIRST AMENDED COMPLAINT

information, business plans, and proprietary techniques related to the 45L tax credit business which were provided in due diligence, which Defendants specifically requested under cover of the NDA and which they are now utilizing to unfairly solicit Ei's current 45L tax credit customers.

81.     Misappropriation of Non-Public Information Related to Ei's "Feature Summaries" Formula.   Ei has developed unique "feature summaries" for builders to optimize their buildings for different climate zones, building codes, program requirements, utility rebate requirements, federal tax credit requirements, and other facts. This formula was developed over years of effort and is a key reason clients choose to work with Ei as the Company has optimized the building formula for them regardless of where they build or what they are trying to achieve. This is the builder's "recipe" to get the maximum benefit for their dollar (*i.e.* window parameters, window shading, window area as a percentage of floor area, insulation type, and other factors).     Such information constitutes a valuable asset of Ei that would be virtually impossible for a competitor to acquire or duplicate other than through disclosure by Ei itself. Ei took reasonable steps to protect this information including through the use of agreements such as the Employment Agreement and NDA.   Each Ei document received by Gallant and Quality Built through the due diligence process was water-marked indicating it was confidential information to Ei. Now, in possession of such information, Defendants on information and belief are utilizing Ei's "Feature Summaries" formula and similar or related trade secret information to solicit and win business from Ei's clients.

82.     Misappropriation of Non-Public and Comprehensive Trade Secrets Related to the Engineering and Energy/Sustainability Business Areas.       Through Gillett's employment with Ei and during the due diligence process, Ei disclosed essentially all of its trade secret information related to the engineering and energy/sustainability spaces, including comprehensive lists of all customers and pricing and all contracts with customers in those spaces; a detailed list of every

FIRST AMENDED COMPLAINT

1    invoice, including customer, date, project, services delivered, and pricing, for the

2    Company and its affiliates; every agreement of all of Ei's customers in these spaces;

3    a detailed list of all of the intellectual property for the Company and its affiliates;

4    financial statements and documents related to the Company's finances with respect

5    to these areas of operation; and proprietary techniques for doing the work.        Such

6    compilation of information constitutes a valuable asset of Ei that would be virtually

7    impossible for a competitor to acquire or duplicate other than through disclosure by

8    Ei itself. Ei took reasonable steps to protect this information including through the

9    use of agreements such as the Employment Agreement and NDA. Each Ei document

10   received by Gallant and Quality Built through the due diligence process was water-

11   marked indicating it was confidential information to Ei. Now, in possession of such

12   information, Defendants are expanding into the areas of engineering and

13   energy/sustainability, in which they did not previously operate, which they would be

14   unable to do without utilizing and misappropriating Ei's trade secrets.

83.        Misappropriation        of Non-Public Market, Customer, and Business

15   Research.    Through Gillett's employment with Ei and during the due diligence

16   process, Ei disclosed essentially all of its trade secret information related to market,

17   customer, and business research, including competitive research, market size and

18   segmentation research, lists of key decision-makers for Ei's customers, and names of

19   market influencers, which Ei spent substantial time gathering and obtaining.        Such

20   information constitutes a valuable asset of Ei that would be virtually impossible for a

21   competitor to acquire or duplicate other than through disclosure by Ei itself. Ei took

22   reasonable steps to protect this information including through the use of agreements

23   such as the Employment Agreement and NDA.        Each Ei document received by

24   Gallant and Quality Built through the due diligence process was water-marked

25   indicating it was confidential information to Ei.        Now, in possession of such

26   information, Defendants on information and belief are utilizing such information to

27   unfairly compete with Ei, including expanding into the areas of engineering and

FIRST AMENDED COMPLAINT

1   energy/sustainability, in which they did not previously operate using Ei's proprietary
2   techniques, and soliciting Ei's customers, which they would be unable to do without
3   utilizing and misappropriating Ei's trade secrets.

84.     Misappropriation      of Ei's Pricing Models.    Through Gillett's
4   employment with Ei and during the due diligence process, Ei disclosed essentially all
5   of its trade secret information related to the Company's pricing models for its
6   products/services. There are hundreds of variations of the particular equipment, its
7   operation, its use in homes, and the costs involved.        Such information is not
8   generally known and constitutes a valuable asset of Ei that would be virtually
9   impossible for a competitor to acquire or duplicate other than through disclosure by
10  Ei itself. Ei took reasonable steps to protect this information including through the
11  use of agreements such as the Employment Agreement and NDA. Each Ei document
12  received by Gallant and Quality Built through the due diligence process was water-
13  marked indicating it was confidential information to Ei. Now, in possession of such
14  information, Defendants on information and belief are utilizing such information to
15  unfairly compete with Ei and solicit Ei's customers.

85.     Misappropriation      of Non-Public Financial Information.    Through
16  Gillett's employment with Ei and during the due diligence process, Ei disclosed
17  essentially all of its trade secret information related to the Company's financials,
18  including intimate details of the Company's financial performance, reporting
19  structure, revenue segmentation, cost of sales components and percent of revenue for
20  each, sales and marketing costs as a percentage of revenue, overhead costs and
21  operating margins for the Company and its affiliates, as well as for each department
22  and geographic region. Such information included the cost structure of the business
23  including the energy/sustainability side of the business. Such information constitutes
24  a valuable asset of Ei that would be virtually impossible for a competitor to acquire
25  or duplicate other than through disclosure by Ei itself. Ei took reasonable steps to
26  protect this information including through the use of agreements such as the

FIRST AMENDED COMPLAINT

1  Employment Agreement and NDA.    Each Ei document received by Gallant and

2  Quality Built through the due diligence process was water-marked indicating it was

3  confidential information to Ei. Now, in possession of such information, Defendants

4  on information and belief are utilizing such information to unfairly compete with Ei,

5  including expanding into the areas of engineering and energy/sustainability, in which

6  they did not previously operate, and soliciting Ei's customers, which they would be

7  unable to do without utilizing and misappropriating Ei's trade secrets.

86.      Misappropriation of Due Diligence Materials. During the due diligence

8  process, Ei disclosed essentially all of its confidential, proprietary, and trade secret

9  information and techniques to Gallant and Quality Built.      Ei has generated the

10  directory structure of the due diligence materials the Company provided to Gallant

11  and Quality Built.    A true and correct copy of the directory is attached hereto as

12  Exhibit 6. Such information contains numerous valuable assets of Ei that would be

13  virtually impossible for a competitor to acquire or duplicate other than through

14  disclosure by Ei itself. Ei took reasonable steps to protect this information including

15  through the use of agreements such as the Employment Agreement and NDA. Each

16  Ei document received by Gallant and Quality Built through the due diligence process

17  was water-marked indicating it was confidential information to Ei.        Now, in

18  possession of such information, Defendants on information and belief are utilizing

19  information contained and provided in this extremely large folder of information to

20  unfairly compete with Ei, including expanding into the areas of engineering and

21  energy/sustainability, in which they did not previously operate, soliciting Ei's

22  customers, and soliciting Ei's employees, which they would be unable to do without

23  utilizing and misappropriating Ei's trade secrets.

24  **FIRST CAUSE OF ACTION**
**Breach of the NDA against Gallant and Quality Built**

26  87.      The allegations of each preceding and subsequent paragraph are

27  incorporated herein by reference.

88.     The NDA constitutes a valid, binding, and enforceable contract between Ei and Gallant and Quality Built.

89.     Ei has fully performed its obligations under the NDA.

90.     On information and belief, Gallant and Quality Built have violated and continue to violate their obligations under the contractual promises made to Ei under the NDA by, among other things, soliciting for employment and employing Gillett and other Ei employees without the prior written consent of the Company prior to the expiration of eighteen months following the Effective Date of that agreement and/or improperly utilizing Ei's confidential, proprietary, and trade secret information and materials for their own benefit.

91.     Gallant and Quality Built's breaches of the NDA have directly and proximately caused and continue to cause irreparable harm to Ei, which lacks an adequate remedy at law.

92.     As a direct and proximate result of Gallant and Quality Built's breaches, Ei has sustained and continues to sustain irreparable injury, the damages from which cannot now be calculated.

93.     Accordingly, Ei is entitled to a temporary restraining order and preliminary injunction or in the alternative damages, costs, and attorneys' fees.

FIRST AMENDED COMPLAINT

**SECOND CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing against Gallant and Quality Built**

94.    The allegations of each preceding and subsequent paragraph are incorporated herein by reference.

95.    The NDA constitutes a valid, binding, and enforceable contract between Ei and Gallant and Quality Built.

96.    Gallant and Quality Built owed a duty of good faith to the Company under the NDA.

97.    Additionally, there was a special relationship and reliance between the Company and Gallant and Quality Built by virtue of the NDA and disclosure of

FIRST AMENDED COMPLAINT

confidential, proprietary, and trade secret information to Gallant and Quality Built.

98.     Gallant and Quality Built breached that duty by performing in a manner that is unfaithful to the purpose of the NDA.

99.     The Company's justified expectations were thus denied.

100.    As a direct and proximate result of Gallant and Quality Built's breaches, Ei has sustained and continues to sustain irreparable injury, the damages from which cannot now be calculated.

**THIRD CAUSE OF ACTION**
**Breach of the Employment Agreement against Gillett**

101.    The allegations of each preceding and subsequent paragraph are incorporated herein by reference.

102.    The Employment Agreement constitutes a valid, binding, and enforceable contract between Ei and Gillett.

103.    Ei has fully performed its obligations under the Employment Agreement.

104.    On information and belief, Gillett has violated and continues to violate his obligations under the contractual promises he made to Ei under the Employment Agreement by, among other things, directly or indirectly soliciting, encouraging, or causing customers of the Company to cease doing business with the Company or to reduce the amount of business such customer does with the Company, directly or

FIRST AMENDED COMPLAINT

18 | improperly disclosing or utilizing Ei's confidential,

~~23~~ proprietary, and trade secret

19 | information and materials for the benefit of Defendants in competition

~~24~~ with and to

20 | the detriment of Ei.

21

105. Gillett's breaches of the Employment Agreement have directly and

22 | proximately

~~1~~ caused and continue to cause irreparable harm to Ei, which lacks an

23 | adequate remedy at law.

106. As a direct and proximate result of Defendants' breaches, Ei has

FIRST AMENDED COMPLAINT

sustained and continues to sustain irreparable injury, the damages from which cannot now be calculated.

107.    Accordingly, Ei is entitled to a temporary restraining order and preliminary injunction or in the alternative damages, costs, and attorneys' fees.

**FOURTH CAUSE OF ACTION**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**against Gillett**

108.    The allegations of each preceding and subsequent paragraph are incorporated herein by reference.

109.    The Employment Agreement constitutes a valid, binding, and enforceable contract between Ei and Gillett.

110.    Gillett owed a duty of good faith to the Company under the Employment Agreement.

111.    Additionally, there was a special relationship and reliance between the Company and Gillett by virtue of his position as President and a fiduciary as well as the disclosure of confidential, proprietary, and trade secret information to him.

112.    Gillett breached that duty by performing in a manner that is unfaithful to the purpose of the Employment Agreement.

113.    The Company's justified expectations were thus denied.

114.    As a direct and proximate result of Gillett's breaches, Ei has sustained and continues to sustain irreparable injury, the damages from which cannot now be calculated.

**FIFTH CAUSE OF ACTION**
**Misappropriation of Trade Secrets under**

FIRST AMENDED COMPLAINT

**Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.* against all Defendants**

15.

115. The allegations of each preceding and subsequent paragraph are

16   incorporated herein

13   by reference.

116. Ei's confidential, proprietary, and trade secret information and materials

17   derive

14   substantial, independent economic value from not being generally known to

18   the public or to its

15   competitors, who could obtain economic value from the

FIRST AMENDED COMPLAINT

1 information. Ei has expended substantial
16 financial and human resources to develop

2 this information, which cannot be easily acquired or
17 replicated by others.

1 17.     Ei has taken reasonable steps under the circumstances to safeguard the
3 confidentiality and secrecy of its confidential, proprietary, and trade secret
4 information and
2 materials.

1 18.     Among other things, Ei has required its employees to sign agreements
5 and conform
3 to policies that include confidentiality provisions, including execution
6 of the Employment
4 Agreement.     Ei has required potential purchasers to sign
7 agreements that include confidentiality
5 provisions, including execution of the NDA.

8     Ei has taken security measures and other measures to
6 protect its ~~confidential, proprietary, and trade secret information and materials.~~

~~79.        Defendants agreed to and acknowledged contracts and policies that include~~
~~7~~~~confidentiality, non-disclosure, and non-use provisions.~~

~~80.        Ei's confidential, proprietary, and trade secret information and materials are~~
~~8~~~~valuable and important to the operation of its business.~~

~~81.        Ei's confidential, proprietary, and trade secret information and materials are not~~
~~9~~~~known to competitors, and not readily ascertainable through proper means by competitors.~~
~~10~~~~Competitors could profit from the use or disclosure thereof.~~

~~82.        Ei is informed and believes that Defendants have used Ei's confidential, proprietary,~~
~~11~~~~and trade secret information and materials without Ei's consent in breach of their duties to Ei to~~
~~12~~~~maintain their secrecy and confidentiality and not to utilize them for their own benefit.~~

FIRST AMENDED COMPLAINT

9    proprietary, and trade secret information and materials.

119.    Defendants agreed to and acknowledged contracts and policies that

10    include confidentiality, non-disclosure, and non-use provisions.

120.    Ei's confidential, proprietary, and trade secret information and materials

11    are valuable and important to the operation of its business.    Ei's trade secrets are

12    related to its services which occur nationwide and are therefore used in interstate

13    commerce.

121.    Ei's confidential, proprietary, and trade secret information and materials

14    are not known to competitors, and not readily ascertainable through proper means by

15    competitors. Competitors could profit from the use or disclosure thereof.

122.    Ei is informed and believes that Defendants have used Ei's confidential,

16    proprietary, and trade secret information and materials without Ei's consent in

17    breach of their duties to Ei to maintain their secrecy and confidentiality and not to

18    utilize them for their own benefit.

123.    Defendants' conduct constitutes a misappropriation and misuse of Ei's

19    confidential, proprietary, and trade secret information and materials.

124.    If Defendants are permitted to continue to unfairly compete with Ei as

20    described

14 herein, they will continue to use Ei's confidential, proprietary, and trade

FIRST AMENDED COMPLAINT

secret information and

15 materials to their advantage in competition with Ei and to the

irreparable detriment of Ei.

125. Upon information and belief, Defendants' actions and conduct were oppressive,

16 fraudulent, willful and malicious, and in conscious disregard of the rights

of Ei.

126. By reason of Defendants' violations of the Defend Trade Secrets Act, 18 U.S.C.

17 §§ 1836, et seq. and related statutes, Ei faces immediate, substantial, and

irreparable harm for

18 which there is no adequate remedy at law.

127. As a direct and proximate result of Defendants' violations of the Defend Trade

Secrets Act, 18 U.S.C. §§ 1836, et seq., Ei has sustained and will continue to sustain irreparable

injury, the damages from which cannot now be calculated, but which exceed $75,000.

Accordingly, Ei is entitled to a temporary restraining order and a preliminary injunction,

or in the alternative damages, compensatory and exemplary damages, and attorneys' fees.

**SIXTH CAUSE OF ACTION**
**Misappropriation of Trade Secrets under**
**Nevada Trade Secrets Act, NRS Chapter 600A against all Defendants**

128. The allegations of each preceding and subsequent paragraph are incorporated herein by reference.

FIRST AMENDED COMPLAINT

15    derive

8 substantial, independent economic value from not being generally known to

16    the public or to its

9 competitors, who could obtain economic value from the

17    information. Ei has expended substantial

10 financial and human resources to develop

18    this information, which cannot be easily acquired or

11 replicated by others.

130.    Ei has taken reasonable steps under the circumstances to safeguard the

19    confidentiality and secrecy of its confidential, proprietary, and trade secret

20    information and

13 materials.

131.    Among other things, Ei has required its employees to sign agreements

21    and conform

14 to policies that include confidentiality provisions, including execution

1 of the Employment

~~15~~ Agreement.     Ei has required potential purchasers to sign

2 agreements that include confidentiality

~~16~~ provisions, including execution of the NDA.

3 Ei has taken security measures and other measures to

~~17~~ protect its ~~confidential, proprietary, and trade secret information and materials.~~

~~92.        Defendants agreed to and acknowledged contracts and policies that include~~

~~18~~ ~~confidentiality, non-disclosure, and non-use provisions.~~

~~93.        Ei's confidential, proprietary, and trade secret information and materials are~~

~~19~~ ~~valuable and important to the operation of its business.~~

~~94.        Ei's confidential, proprietary, and trade secret information and materials are not~~

~~20~~ ~~known to competitors, and not readily ascertainable through proper means by competitors.~~

~~1~~ ~~Competitors could profit from the use or disclosure thereof.~~

~~95.        Ei is informed and believes that Defendants have used Ei's confidential, proprietary,~~

~~2~~ ~~and trade secret information and materials without Ei's consent in breach of their duties to Ei to~~

~~3~~ ~~maintain their secrecy and confidentiality and not to utilize them for their own benefit.~~

~~96.        Defendants' conduct constitutes a misappropriation and misuse of Ei's~~ confidential,

4 proprietary, and trade secret information and materials.

132.     Defendants agreed to and acknowledged contracts and policies that

5 include confidentiality, non-disclosure, and non-use provisions.

133.     Ei's confidential, proprietary, and trade secret information and materials

6 are valuable and important to the operation of its business.

134.     Ei's confidential, proprietary, and trade secret information and materials

7 are not known to competitors, and not readily ascertainable through proper means by

8 competitors. Competitors could profit from the use or disclosure thereof.

135.     Ei is informed and believes that Defendants have used Ei's confidential,

9 proprietary, and trade secret information and materials without Ei's consent in

FIRST AMENDED COMPLAINT

utilize them for their own benefit.

136.　　Defendants' conduct constitutes a misappropriation and misuse of Ei's confidential, proprietary, and trade secret information and materials.

137.　　If Defendants are permitted to continue to unfairly compete with Ei as described herein, they will continue to use Ei's confidential, proprietary, and trade secret information and materials to their advantage in competition with Ei and to the irreparable detriment of Ei.

138.　　Upon information and belief, Defendants' actions and conduct were oppressive, fraudulent, willful and malicious, and in conscious disregard of the rights of Ei.

139.　　By reason of Defendants' violations of the Nevada Trade Secrets Act, NRS Chapter 600A, Ei faces immediate, substantial, and irreparable harm for which there is no adequate remedy at law.

140.　　As a direct and proximate result of Defendants' violations of the

FIRST AMENDED COMPLAINT

Nevada Trade

Secrets Act, NRS Chapter 600A, Ei has sustained and will continue to

sustain irreparable injury,

the damages from which cannot now be calculated, but

which exceed $75,000. Accordingly, Ei is

entitled to a temporary restraining order

and a preliminary injunction or in the alternative damages, compensatory and

exemplary

damages, and attorneys' fees.

## SEVENTH CAUSE OF ACTION
### Breach of Fiduciary Duty against Gillett

141.    The allegations of each preceding and subsequent paragraph are

incorporated herein

by reference.

142.    As President of Ei, a trusted major shareholder, and otherwise, Gillett

owed the

Company a fiduciary duty.

143.    Gillett breached his fiduciary duty to the Company by engaging in the

conduct

alleged herein, including by, among other things, engaging in conduct and

improper

communications which undermined Ei's efforts to reach a deal with

████████, Ei's

negotiations with respect to reaching a deal with Gallant / and Quality

Built, and Ei's efforts to reach any

deal related to the potential acquisition or

FIRST AMENDED COMPLAINT

3 the Employment Agreement;

15 assisting in Gallant, and Quality Built's violations of the terms of the

4 NDA; and/or

16 improperly disclosing or utilizing Ei's confidential, proprietary, and trade secret

17 information and materials for his own benefit and the benefit of Gallant, and Quality

18 Built.

144. Gillett also

6 breached his fiduciary duty by failing to discharge his duties

19 as President in good faith and for the

7 benefit of the Company during the term of his

20 position in that role.

145. As a direct and proximate result of Gillett's breaches of his fiduciary

21 duty, the

8 Company has sustained and continues to sustain damages in an amount to

22 be proven at trial.

28

9 **EIGHTH CAUSE OF ACTION Usurpation of Corporate Opportunity against Gillett**

11

2

146. The allegations of each preceding and subsequent paragraph are

3 incorporated herein

12 by reference.

147. As described herein, a corporate opportunity was presented to Ei and

4 Gillett which

13 was within the Company's line of ~~Business~~business in the form of a potential

5 acquisition by Gallant and Quality Built.

148. The Company had an interest or expectancy in the opportunity.

149. Ei was financially able to exploit, undertake, or take practical advantage

6 of the

FIRST AMENDED COMPLAINT

150.    The opportunity was one which Ei had an interest or reasonable expectancy.

151.    By embracing and/or exploiting the opportunity, the self-interest of Gillett was brought into conflict with that of Ei and placed Gillett in a position contrary to his duties to the company.

152.    As a direct and proximate result of Gillett's conduct, the Company has sustained and continues to sustain damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
### Tortious Interference with Contractual Relations against all Defendants

153.    The allegations of each preceding and subsequent paragraph are incorporated herein by reference.

154.    A contractual relationship existed between Ei and ███████ by virtue of the ███████, and between Ei and Gallant/ and Quality Built by virtue of the Gallant LOI, with the probability of future economic benefit to Ei thereby.

155.    Defendants knew about the ███████ LOI and Gallant LOI .

156.    Despite knowledge of the ███████ LOI, Defendants engaged in wrongful conduct by which they intended to harm Ei and/or disrupt the relationship between Ei and ███████ or were substantially certain such harm and/or

disruption would occur, including but not limited to engaging in multiple and

52

6 the

3    exclusivity period of the ▮▮▮▮▮▮▮ ~~LOI~~, and Gallant ~~/~~ and Quality Built's solicitation

4    of Gillett

7 during same.

157.    Despite Gillett's knowledge of the ~~Gallant LOI~~ ▮▮▮▮▮▮▮, Gillett engaged in

5    wrongful conduct

8 by which he intended to harm Ei and/or disrupt the relationship

6    between Ei and Gallant ~~/~~ and Quality

9 Built or was substantially certain such harm

7    and/or disruption would occur, including but not

10 limited to engaging in multiple and

8    repeated improper communications and exchanging of

11 information during the

9    effective period of the ~~Gallant LOI~~ .

158.    Defendants had no privilege or justification for their conduct.

159.    As a direct and proximate result of Defendants' conduct, disruption to

10    the ▮▮▮▮▮▮▮

12 relationship between Ei and ▮▮▮▮▮▮▮ and Ei and Gallant ~~/~~ and Quality Built

11    occurred, directly and

13 proximately causing Ei to sustain damages in an amount to be

12    proven at trial.

13                                      **TENTH CAUSE OF ACTION**
                        **Tortious Interference with Prospective Economic Advantage**
14                                        **against all Defendants**

160.    The allegations of each preceding and subsequent paragraph are

15    incorporated herein

16 by reference.

161.    A contractual relationship existed between Ei and ▮▮▮▮▮▮▮ by

16    virtue of the ▮▮▮▮▮▮▮

~~17LOI~~    , and between Ei and Gallant ~~/~~ and Quality Built by virtue

17    of the ~~Gallant LOI~~ , with the

18 probability of future economic benefit to Ei thereby.

FIRST AMENDED COMPLAINT

163.    Despite knowledge of the ███████ ~~LOI~~, Defendants engaged in wrongful conduct

by which they intended to harm Ei and/or disrupt the relationship between Ei and ███████ or were substantially certain such harm and/or disruption would occur, including but not limited to engaging in multiple and repeated improper communications and exchanging of information during the

exclusivity period of the ███████ ~~LOI~~, and Gallant~~/~~ and Quality Built's solicitation of Gillett during same.

164.    Despite Gillett's knowledge of the ~~Gallant LOI~~ ███████, Gillett engaged in wrongful conduct by which he intended to harm Ei and/or disrupt the relationship between Ei and Gallant~~/~~ and Quality Built or was substantially certain such harm and/or disruption would occur, including but not limited to engaging in multiple and repeated improper communications and exchanging of information during the effective period of the ~~Gallant LOI~~.

165.    Defendants had no privilege or justification for their conduct.

166.    As a direct and proximate result of Defendants' conduct, disruption to the ███████ relationship between Ei and ███████ and Ei and Gallant~~/~~ and Quality Built occurred, directly and

FIRST AMENDED COMPLAINT

10 | proven at trial.

11 | ### ELEVENTH CAUSE OF ACTION
~~Injunctive Relief against all Defendants~~ **Tortious Interference with Contractual Relations against Gallant and Quality Built**

12 |

167. The allegations of each preceding and subsequent paragraph are

13 | incorporated herein by reference.

168. A contractual relationship existed between Gillett and Ei by virtue of

14 | the Employment Agreement.

169. Gallant and Quality Built knew about the Employment Agreement.

170. Despite knowledge of the Employment Agreement, Gallant and Quality

15 | Built engaged in wrongful conduct by which they intended to harm Ei and/or disrupt

16 | the relationship between Ei and Gillett or were substantially certain such harm and/or

17 | disruption would occur, including but not limited to assisting Gillett in soliciting Ei

18 | customers and employees and utilizing confidential information in violation of his

19 | Employment Agreement.

171. Gallant and Quality Built had no privilege or justification for their

20 | conduct.

172. As a direct and proximate result of Gallant's and Quality Built's

1 | conduct, disruption to the relationship between Ei and Gillett occurred, directly and

2 | proximately causing Ei to sustain damages in an amount to be proven at trial.

3 | ### TWELFTH CAUSE OF ACTION
**Tortious Interference with Contractual Relations against Gillett**

4 |

173. The allegations of each preceding and subsequent paragraph are

5 | incorporated herein by reference.

174. A contractual relationship existed between Gallant and Quality Built

6 | and Ei by virtue of the NDA.

175. Gillett knew about the NDA.

176. Despite knowledge of the NDA, Gillett engaged in wrongful conduct by

7 | which he intended to harm Ei and/or disrupt the relationship between Ei and Gallant

55

FIRST AMENDED COMPLAINT

9      occur, including but not limited to assisting Gallant and Quality Built in soliciting Ei

10    employees and utilizing confidential information in violation of the NDA.

177.      Gillett had no privilege or justification for their conduct.

178.      As a direct and proximate result of Gillett's conduct, disruption to the

11    relationship between Ei and Gallant and Quality Built occurred, directly and

12    proximately causing Ei to sustain damages in an amount to be proven at trial.

13                              **THIRTEENTH CAUSE OF ACTION**
                                **Injunctive Relief against all Defendants**

16
21

22
             179.    The allegations of each preceding and subsequent paragraph are

incorporated herein

17 by reference.

23

24
             180.    As a result of the foregoing and ongoing acts of Defendants, Ei has

suffered and will

18 continue to suffer immediate and ongoing irreparable injury for

25
which no adequate remedy at law

19 exists. Therefore, Ei is entitled to temporary and

26
preliminary injunctive relief requested below,

20 costs, and attorneys' fees.

27
             181.    Defendants' actions entitle Ei to injunctive relief pursuant to Federal

28

FIRST AMENDED COMPLAINT

1 Rule of Civil

21 Procedure 65, the Defend Trade Secrets Act, §§ 1836, et seq., the

2 Nevada Trade Secrets Act,

22 NRS Chapter 600A, and other applicable laws, equitable

3 principles prohibiting Defendants from

23 using property belonging to Ei as described

4 herein, and/or the provisions of the contracts between

24 Ei and Defendants

182. Unless such injunctive relief is granted, the ongoing conduct of

5 Defendants will

1 continue to cause Ei irreparable harm for which no adequate remedy

6 at law exists.

7 **JURY TRIAL DEMAND**

8 Ei demands a trial by jury on any issue so triable.

9 **RELIEF REQUESTED**

10 WHEREFORE, Ei respectfully requests that a Judgment be entered in its favor against

5 ~~Gillette~~ Gillett and Gallant~~/~~ and Quality Built as follows:

A. For a temporary restraining order and preliminary injunction enjoining

12 Gillett and

6 Gallant~~/~~ and Quality Built from engaging in ongoing breaches of their

13 agreements and obligations with

7 the Company;

B. For a temporary restraining order and preliminary injunction enjoining

14 Gillett and

8 Gallant~~/~~ and Quality Built from engaging in ongoing misuse and

15 appropriation of the Company's

FIRST AMENDED COMPLAINT

16   confidential, proprietary, and trade secret information;

C.       For damages according to proof at trial;

D.       For exemplary and/or punitive damages according to proof at trial;

E.       For an award of Ei's fees and costs; and

F.       For such other relief as the Court as deemed appropriate by this Court. 24

25

26

27

28

FIRST AMENDED COMPLAINT

DATED: ~~June 16,~~ August 26, 2020

PROCOPIO, CORY, HARGREAVES ~~PROCOPIO, CORY, HARGREAVES~~

& SAVITCH LLP

By: ~~/s/~~ *s/ Eric A. Plourde*
~~Lance Coburn~~_____

Eric A. Plourde
Brook T. Barnes

~~Lance Coburn (Bar No. 6604) 3960 Howard Hughes Pkwy, Suite 500 Las Vegas, NV 89169 Telephone: 702.216.2684 Facsimile: 619.788.5500~~ Attorneys for Plaintiff Ei Corporation, Inc., a Nevada Corporation

*(pro hac vice)* Jeffrey A. Garofalo

FIRST AMENDED COMPLAINT

26

27

28

FIRST AMENDED COMPLAINT

Document comparison by Workshare 9 on Wednesday, October 21, 2020 5:27:28 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\tpalomares\Documents\2. Katie\Gallant - Ei\October 21\Ei Corp v. Gallant Complaint (Redacted) 4819-1924-9601_1.pdf |
| Description | Ei Corp v. Gallant Complaint (Redacted) 4819-1924-9601_1 |
| Document 2 ID | file://C:\Users\tpalomares\Documents\2. Katie\Gallant - Ei\October 21\USDC Doc# 92 (Redacted) First Amended Complaint 4832-7539-5785_1.pdf |
| Description | USDC Doc# 92 (Redacted) First Amended Complaint 4832-7539-5785_1 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 2123 |
| Deletions | 611 |
| Moved from | 5 |
| Moved to | 5 |
| Style change | 0 |

| Format changed | 0 |
|---|---|
| Total changes | 2744 |